IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2018

## VICTOR THOMPSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County**
No. 18590     Clayburn Peeples, Judge

_____

### No. W2017-00679-CCA-R3-PC

_____

Petitioner, Victor Thompson, appeals the denial of his post-conviction petition. Petitioner argues that he was denied the right to testify at trial, and trial counsel was ineffective for failing to request a *Momon* hearing.  Following a review of the briefs of the parties and the entire record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Brian Clay Johnson, Jackson, Tennessee (on appeal) and Christie Hopper, Jackson, Tennesseee (at trial), for the appellant, Victor Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry G. Brown, District Attorney General; and Hillary Parham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Background*

The facts of this case as set forth by this court on direct appeal are as follows:

> This case relates to the stabbing death of Charlie Reagan.  The evidence shows that Carl Pickler was good friends with the victim, the owner of a local muffler shop.  They visited almost daily at the victim's shop, and Mr. Pickler routinely picked up automotive parts for the victim.  On June 16, 2011, Mr. Pickler stopped by the shop to determine if the victim

needed parts. When he was there, a customer paid the victim $200, and the victim placed the cash in his shirt pocket. Mr. Pickler saw the Defendant ask the victim to use his telephone, and the victim told the Defendant where to find the telephone. The victim was known to keep watermelons and a large knife near the telephone the Defendant used. As Mr. Pickler began to leave the shop, he heard the victim yell, "No." Five or six minutes after Mr. Pickler left, he saw police cars traveling toward the shop. He learned minutes after seeing the police cars that the victim had been stabbed.

The victim was known to keep about $300 or $400 in his pants pocket. The victim always paid Mr. Pickler with cash from his pants pocket for automotive parts. The day of the killing, though, Mr. Pickler saw the victim place the $200 from the customer in his shirt pocket.

Mike Williams arrived at the victim's muffler shop for new tires around 2:40 p.m. He found the victim face down and attempted to wake him. The victim told Mr. Williams to call 9-1-1 and said, "I've been stabbed and I'm dying." The victim lifted his right hand into the air and shook it and went limp.

Laura Hardin, a registered nurse, treated the victim in the emergency room at Milan General Hospital. The victim did not have a heart beat or a pulse when he arrived, although CPR continued for sometime. She saw four stab wounds to the abdomen. Several medications were administered and medical procedures were unsuccessfully performed in an attempt to restart the victim's heart.

Milan Police Officer Chad Autry was told to be on the look out for the Defendant because Investigator Williams wanted to talk to him about the victim's stabbing. He went to the local Walmart after learning the Defendant was heading there in a red Pontiac with Shadarra Gadlen. He stopped the Pontiac, but the Defendant was not in the car. Ms. Gadlen claimed that she dropped off the Defendant at Walmart. He and Officers Finnessee and Cook found the Defendant at Walmart and arrested him. The Defendant met a Walmart employee and placed a bag of clothes on the employee's car. The bag contained bloody clothes, a telephone, a video camera, and shoes. The clothes were sent to the Tennessee Bureau of Investigation (TBI) crime laboratory for analysis. The Defendant did not have visible injuries, weapons, or money at the time of his arrest. Ms. Gadlen's Pontiac was later searched by Humbolt police.

Milan Police Investigator Jason Williams, the lead investigator assigned to this case, asked the victim who hurt him, but the victim was unable to talk. He identified photographs of a homemade mallet or hammer lying near the victim, which had blood on it, and a pool of blood in the area where the victim was found. A bloody, large socket wrench and a pair of pliers were found at the scene. The hammer, socket wrench, and pliers were sent to the TBI crime laboratory for analysis. Blood spatter was found on the wall and boxes nearby, and swabs were taken to the TBI crime laboratory for analysis. Footprints leading from the back door of the victim's shop were also recovered. A customer's check was found on the desk inside the office, but no cash was found. The victim's family later found cash in the shop. The victim's clothes were sent to the TBI crime laboratory for analysis. Investigator Williams learned from an informant that the Defendant might have been involved in the victim's death.

The Defendant's recorded police interview was played for the jury. The Defendant stated that when he arrived at the shop an older man was there and that a woman also stopped by the shop. He was embarrassed and waited for them to leave but talked to the older man. He asked the victim for a job, but the victim refused. He asked the victim why he could not have a job because he had previously worked for the victim. He said that the victim called him a "n——," that he told the victim he was not a "n——," and that the victim picked up a sledge hammer and came toward his face. The Defendant said that he attempted to block the hammer but that it hit his face and "busted his lip." The Defendant grabbed a knife when the victim came toward him with the hammer. He claimed that the victim came at him several times, that the knife went into the victim, and that he did not "give it a force." They struggled, and the knife "slid across" the Defendant's hand because his hand was loose around the knife handle. The Defendant picked up the knife and ran. He provided the police directions to the knife's location. The knife matched a knife set owned by the victim.

The Defendant claimed to have mentioned the killing to his uncle Bug when he was at his uncle's mother's house in Milan on the day of the stabbing. His then-girlfriend was with him when he spoke to his uncle, but the Defendant denied telling her what occurred, although he told her he might have killed someone. When asked if he thought the victim was going to hurt him, he said, "No, I didn't think—I don't know if he'd hurt . . . I really thought I was gonna use my fist, but then I saw the knife and I was like, he got a hammer." He denied taking anything from the victim. The Defendant had $11 at the time of his arrest. The Defendant

changed clothes before the interview and admitted the clothes he wore during the stabbing were inside the bag recovered by the police. Buccal swabs were obtained from the Defendant and sent to the TBI crime laboratory for analysis. Although the Defendant said the victim hit him with a hammer in the lobby of the muffler shop, no blood was found there. All the blood was found in the shop area. Investigator Williams did not see any wounds on the Defendant's head or lip, although the Defendant had a small cut to his finger.

Investigator Williams believed a robbery occurred because no money was found at the scene, although the victim's wallet, pocket calend[a]r, and some money were found by the victim's family. The victim's family found $599 cash at the victim's shop, which was provided to the police. The $200 cash given to the victim by the customer the day of the stabbing was not found. Although money was found inside the shop sometime after the killing, no money was found on the victim's person. It was this missing money that was the basis for the robbery charge.

Chad Ferrell, the victim's son-in-law, knew the victim always to have money in his pockets when he was at work. He recalled one occasion when the victim pulled $3000 from his pocket to help Mr. Ferrell purchase a truck. He said the victim carried money loose in his pants pocket. Mr. Ferrrell found the victim's wallet and calend[a]r wallet inside the shop in its usual place two days after the killing.

Sara Reagan, the victim's daughter, knew the victim to keep money in his right pocket. Larry Reagan, the victim's brother, knew the victim always carried money in either his pants or shirt pockets. The victim kept the money folded in his shirt and pants pockets and used it to make change for his customers.

Shadarra Gadlen and the Defendant were "trying to date" before his arrest. She and the Defendant visited often, and he spent the night at her apartment a few times. On June 16, 2011, she visited her friend, T.J., in Milan, and the Defendant asked to join her. The Defendant asked to be dropped off at the four-way stop just inside the Milan city limits. She dropped off the Defendant and met her friend. Before she and the Defendant drove to Milan, the Defendant had money and helped pay for gas. She took him to Walmart earlier that week to pick up at least $50 from his father. The Defendant arrived at T.J.'s house sometime after lunch and asked if she was ready to leave, and they left. The Defendant was not wearing a shirt when he arrived. As they got in her car, the Defendant asked to stop by a friend's house, and she took him there.

- 4 -

The Defendant talked to his friend, and they left between 2:00 and 3:30 p.m. and returned to her apartment. The Defendant offered to pay for gas on the way home. The Defendant took a shower when they arrived at her apartment and watched television but left to talk to his cousin. The Defendant returned and asked her to drive him to the Walmart in Milan because of a family emergency. She drove the Defendant there and noticed he had a bag of clothes, money, and a cell phone. The Defendant told her, "Today, I hurt someone." She thought the Defendant was in a fight, but the Defendant said, "I killed someone."

Ms. Gadlen thought the Defendant acted "weird" when they returned to her apartment because he paced and talked to various people on the phone. She did not recall the Defendant's complaining of a headache or seeing a busted lip. She only saw a little, thin cut on his finger. She said the Defendant lied about his name and his age. Although she denied that the Defendant had a "larger" amount of money after they returned from Milan, she said the Defendant's "roll" of money looked "fairly larger."

Jason McCain had known the Defendant for about five years. On June 16, 2011, he saw the Defendant at Mr. McCain's mother's house in Milan, which was a two minute drive from the victim's shop. He called the Defendant that day, who came to see him immediately. They talked, and the Defendant admitted stabbing and killing someone and taking money from the person he killed.

William Jerrell had known the Defendant for about seven years and had served time in jail with the Defendant. When they were both in police custody, the Defendant told him that he planned to go "in there" and take money but that things did not go as planned. It was supposed to be "a run of the mill robbery." The Defendant heard the victim had money, did not expect the victim to fight back, and stabbed the victim when he fought back. The Defendant took up to $4000 from the victim and bragged about "getting" thousands of dollars. The Defendant threatened to "do [Mr. Jerrell] just like he did that old man" if he testified. The Defendant referred to the victim as the old man.

Justin Adams also spent time in the local jail with the Defendant. The Defendant admitted killing the victim "[b]ecause he wouldn't sell me no tires" and taking $4000. The Defendant said the victim fought back with a hammer when the victim was about to stab him. The Defendant assaulted Mr. Adams and threatened that he knew "gang people" who could "get" to Mr. Adams's family.

Gibson County Correctional Officer Joel Hughey was involved in an altercation with the Defendant after attempting to remove contraband from his cell. The Defendant stated, "Well, you know what happened to Charlie. It will happen to you, too." A second altercation occurred during the Defendant's pretrial confinement regarding a lighter the Defendant had inside his cell. Sergeant Bobby Rogers and Officer Chad Droke searched the Defendant's cell after they smelled something burning. The officers attempted to perform a strip search, but the Petitioner refused and said, "Y'all are just picking on me because I killed your friend, Charlie Reagan." The Defendant threatened to kill Officers Hughey and Droke.

TBI Special Agent Jennifer Milsaps, an expert in serology and DNA analysis, analyzed the evidence. She concluded that the victim's blood and DNA were on the hammer and that partial DNA profiles matching the Defendant were on four places on the handle of the hammer. She concluded that a partial DNA profile matching the victim's was on the socket. Regarding the Defendant's clothes recovered at the time of his arrest, she concluded that the victim's blood and DNA were on the front, lower right portion of the blue t-shirt and that the victim's DNA was on the Defendant's jeans. Although blood was present on the knife blade and handle, she was unable to detect the presence of DNA.

Miguel Laboy, an expert in the field of forensic pathology, performed the victim's autopsy and concluded that the cause of death was sharp force injuries to the chest. He found four stab wounds and one superficial incision. One stab wound extended into the chest cavity, injured three ribs, and perforated the lower right lung. Another stab wound perforated the left chest wall and penetrated the left chest. A third stab wound penetrated the soft tissue of the abdominal wall. He concluded that the victim died within minutes to hours of receiving the injuries and that it was possible the victim was able to fight his attacker before collapsing. The victim had defensive wounds on his left cheek, right arm, right elbow, right forearm, right wrist, right hand, left elbow, left hand, left middle knuckle, and left ring finger.

Upon this evidence, the jury convicted the Defendant of second degree murder and theft. The trial court sentenced the Defendant as a Range I, standard offender to consecutive terms of twenty-five years for second degree murder and eleven months, twenty-nine days for theft. This appeal followed.

*State v. Thompson*, No. W2013-00226-CCA-R3CD, 2014 WL 605441, at *1-5 (Tenn. Crim. App. Feb. 14, 2014)

*Post-Conviction Hearing*

Petitioner testified that he wanted to testify on his own behalf at trial. He and trial counsel discussed the issue, and he said that he wrote to trial counsel several times about the matter. He said that one letter was written on January 3, 2012, before trial, asking trial counsel when he could testify. Petitioner testified that trial counsel wanted him to accept a plea offer. He said that he wanted to testify because there were no other witnesses to the crime, and he was the "only person that could have testified in my behalf as to what exactly took place and how it took place. . . ." Petitioner testified that he told trial counsel that he acted in self-defense and that he repeatedly told trial counsel that he wanted to testify at trial.

Petitioner testified that he was not familiar with a *Momon* hearing at the time of trial, but he knew what it was at the time of the post-conviction hearing. He said that there was no *Momon* hearing outside the presence of the jury during his trial. Petitioner also read a portion of the trial transcript during which trial counsel told the trial court that trial counsel did not want a *Momon* hearing. Petitioner testified that he was never questioned about his desire to testify, and he wanted to testify.

Petitioner testified that he was on medication at the time of trial due to his mental health evaluation. He was taking Thorazine and Benadryl which slowed his thought process and comprehension. Petitioner testified that the medication also affected him "memory wise." He said that if he had not been on the medication, he would have told the trial court that he wanted to testify.

When asked what his trial testimony would have been, Petitioner testified that he would have told the jury that he went to the victim's muffler shop to seek employment because he was previously employed by the victim. He said that there were some customers in the shop, including Mary Quinton and Carl Pickler, and the victim told him to hold on. Petitioner testified that he helped the victim with Mr. Pickler's muffler and asked the victim about a job. He said that the victim yelled: "I do not want a [racial slur] working for me because somebody just stole something from me yesterday[.]" Petitioner testified that Mr. Pickler left the shop, and Petitioner told the victim was he was not a [racial slur] and asked the victim not to refer to him as such. He said that the victim again called him [racial slur] because he was black, and Petitioner responded that he was black but not a [racial slur]. Petitioner testified that the victim picked up a hammer and started toward him, and petitioner apologized to the victim. He said:

Right there by that phone was - - there was a steak knife right there. Now, when - - when we came out the shop, when we was - - we was

- 7 -

coming out the - - the little waiting area where it's nice and cool into the shop, which is like the garbage area where there is heat, when he picked the mallet up, he came towards me and when he's coming towards me, I can't - - I'm not going to turn my back when there's a hammer coming towards me. I'm not going to. Period. Ever in my life.

So I - - I put my hands up to stop the swing, and I stopped it, but it still hit me through my - - it still hit me a little bit. It busted my lip. And I picked the knife up off the shelf. When I picked the knife - - The shelf was close to the exit of the - - of the garage.

So I picked the knife up in my hand, and I held the knife up. He still kept on coming at me. When he came at me, he swang again, but he didn't get me because I put my arms up. It hit my hand, and I put the knife in him. Every time he came at me, I stabbed him.

\*      \*      \*

To tell you the truth, I did not go towards him. I - - I - - I was - - I had the knife. I was so nervous and had the knife so loosely in my hand that the knife actually slipped and cut my hand. I still have the scar to this day, and it slid on a - - on a downward cut, which means that I had the knife - - the point was protruding from the - - the palm, which means that I'm - - I'm – I have the back of my hand to protect my body - -

Petitioner testified that he was backing away from the victim, and the victim advanced toward him four times. He said that the victim fell to the floor after the fourth time that Petitioner stabbed him. Petitioner testified that he then left out the back door, and "kept on running . . ." until he got tired. When asked about the victim's tone before the stabbing, Petitioner testified: "He snapped clean off." He also said that the victim appeared angry. Petitioner agreed that his argument with the victim was confrontational until "it got physical." Petitioner testified that his testimony could have corroborated Mr. Pickler's testimony that he heard the victim say, "No," as Mr. Pickler was leaving the shop.

Petitioner testified that he told Jason McCain what happened, and Mr. McCain advised him to stay out of town and to not go to the police. Petitioner said that he could have testified at trial that he was a non-violent person and had not had any charges of violence prior to the victim's murder. He agreed that he "recently just got in trouble for something that has something to do with violence on my name and that's from me coming to this jail." He acknowledged getting into several physical altercations while in prison.

- 8 -

Petitioner agreed that William Jarrell testified at trial that Petitioner said he stole $4,000 from the victim and that Petitioner went to the muffler shop for the purpose of robbing the victim and that the robbery went bad. Mr. Jarrell also testified that Petitioner told him that he did not expect the victim to fight back and that Petitioner was "scared and really didn't know that was going on at the time. All he knew is or was afraid that [the victim] would hurt him." Petitioner testified that he knew Mr. Jarrell because they were in confinement together. He denied telling Mr. Jarrell anything about his case, and he would have testified at trial that the other inmates "joked around" with his case because they had nothing else to do. Petitioner testified that his case was a "high profile" case, and it was of interest to other inmates in the jail and some of the officers. Petitioner agreed that Mr. Jarrell testified at trial "that he would get his charge dropped that he had inside this county because he had - - he was on probation or something for another charge." He agreed that trial counsel cross-examined Mr. Jarrell about the deal he would receive for testifying against Petitioner, but he said that trial counsel did not go into enough detail.

Petitioner testified that Justin Adams was also confined in the same cell with Mr. Jarrell, who Petitioner had previously testified was in solitary confinement. He said that Mr. Adams testified that Petitioner killed the victim "for $4,000.00 and that I wanted to rob him for some - - because he wouldn't sell me no tires." Petitioner said that if he had been allowed to testify at trial he would have told the jury that Mr. Jarrell and Mr. Adams were cell mates and that they did not get along with Petitioner "at all. Period." Petitioner testified that he and Mr. Adams had a physical altercation at the jail over Petitioner's case and the jokes that were being made about Petitioner's case. He thought that Mr. Adams also had a deal with the State to testify against him. Petitioner said that he would have disputed all of Mr. Adams' testimony if Petitioner had testified at trial. He said that he never went to the victim's shop to buy tires because he walked there.

Petitioner testified that he would have also rebutted the testimony of Officer Joel Hughey. He said that he and Officer Hughey had "so much conflict before trial and after trial and, I guess, during the trial because he came and testified on me too." Petitioner testified that Officer Huey's testimony at trial was a "misstatement." He said he got into an altercation with Officer Huey over some cigarettes. Petitioner claimed that Officer Huey's testimony was false because Petitioner only had a "wick" for somebody else to smoke rather than a cigarette, and Officer Huey got mad when Petitioner tossed the wick into the toilet. Petitioner denied telling Officer Huey that he was going to treat Officer Huey like he had treated the "old man." Petitioner testified that he had issues with other correctional officers too because they all knew the victim and the officers beat Petitioner so badly that he defecated blood. He claimed that the beatings occurred every week.

Petitioner acknowledged that his statement was played for the jury. He said:

- - My concern was that during that . . . statement, it was so - - it was fresh because it was the same night of the murder, and I - - I cried, and I - - I was - - so I was breaking apart and from time-to-time to actually give an in-depth explanation to the - - to the - - the investigator at the night of the crime took place, and I could have - - I could have elaborated into each part of the statement. I could have broken it down as to exactly what took place and elaborated more onto each part where so the jury can get a clear understanding as to what took place, so they could have a clearer vision as to how each step happened.

On cross-examination, Petitioner testified that trial counsel waived his right to testify without a hearing and without his consent. He said that when the trial began, he was under the presumption that he was going to testify. Petitioner testified that trial counsel was trying to get Petitioner's grandmother to tell him not to testify and to accept a plea deal.

Petitioner said that he could have testified at trial concerning his second interview that was played for the jury. He also would have testified that the crime scene photographs of the "blood spatters that . . . was exactly where I said it . . . was when I said I pulled the knife out right when I fell into the chair. There's blood spatter right arm [sic] on the chair." Petitioner further testified that he could have testified that Officer Huey, Mr. Jarrell, and Mr. Adams committed perjury. When asked what his testimony would have added to the second statement, Petitioner replied: "I wouldn't never changed my statement, ma'am." Petitioner then testified:

It was about 1 o'clock, what 12 o'clock, 1 o'clock, 2 o'clock. And I wasn't functioning properly, and there was so much more stuff that I could have spoke on, like I said, in pertaining to exactly how - - how the incident took place, from where it started, what words were exchanged, who moved what certain type of way, where - - what - - where did he move from, what location that it - - that it started, what words were exchanged, who moved what certain type of way, where - - what - - where did he move from, what location that it - - that it started, and what location did it ended [sic] because there were two different locations because it did - - the verbal altercation started in the little resting area. Now, the physical part got into the - - the bay area where - - where the lift is at, the car lift, and all that.

Now, please note, by the blood, like - - like I said, I also could have testified to the crime scene photographs. Now, if you - -No, that's  - - that's factual evidence.

And that second - - that second statement I made shows that I wasn't lying by the factual evidence, by the photographic evidence, by the blood splatter being right here, blood splatter being - - being on the arm of the chair, blood splatter being all over. You know what I'm saying, ma'am? That - - That shows that's mutual combat.

Even by the hammer, the mallet that I complained of being hit with, I described that. Out of all the tools in that shop, ma'am, I described exactly how it looked the same night. Exactly how it looked. And it was - - And it was [. . .], if you look at the crime scene photographs, it was less than probably two feet from the initial blood - - from the initial blood splatter where the victim was found at, which is [. . .] where I'm meaning, where I'm going at, it was in arm's - - arm's length distance from the victim's - - from the victim. That's what I'm saying, and - - and I'm trying to show that - - that he had a weapon and, yeah, I obtained a weapon that was there already.

\*      \*      \*

Yeah, but I never got a chance to elaborate. There's - - There's - - There's just so much stuff I could have elaborated on. See, you cannot just use my second statement as [. . .] my testimony because there's part [. . .] there's just so much stuff that - - that could have been asked. You know what I'm saying? Questions that could have been asked to clear - - clarify, so it started right here, right? Yeah, it started over here then we went over here. Just - -just something that the jury, I believe the jury need to hear so they could actually see exactly what took place. They can image, put a picture in their mind. You know what I'm saying? To see exactly what took - - what took place, ma'am. That's - - That's what I'm saying.

I wanted the jury to hear my side because there was no other witnesses there, ma'am. I was the only other witness. And [. . .] who could testify for me but me? And - - And my testimony would have been corroborated by factual evidence; photographic evidence; my second statement, which is corroborated by the photographic evidence.

Petitioner testified that he and trial counsel did not "really" discuss all of this before trial and that trial counsel's questions were more focused on whether Petitioner was lying about what happened. He said that trial counsel acted more like an investigator and "not really for me, but against me." When asked if he and trial counsel discussed the advantages and disadvantages of testifying, Petitioner replied: "I just told him that I wanted to testify." He began telling trial counsel that he wanted to testify in January of

- 11 -

2012 if not before that time. Petitioner said that trial counsel advised him not to testify. On redirect examination, Petitioner again went over what his testimony would have been at trial.

Nora Smith, Petitioner's grandmother, testified that Petitioner wanted to testify at trial and "let everyone hear his side of the story, and the lawyer was against it. He wouldn't do it." Ms. Smith said that she talked with trial counsel, and he said that it was better if Petitioner did not testify because Petitioner could "end up with more time, and [trial counsel] wanted [Petitioner] to take a plea of 40 years, and [Petitioner] was against it." On cross-examination, Ms. Smith testified that she and trial counsel discussed the pros and cons of Petitioner testifying at trial. She said that Petitioner was present when they discussed the issue, and trial counsel would walk out of the room so that she and Petitioner could discuss the matter. Ms. Smith testified that Petitioner's aunts encouraged him to accept the plea offer. Ms. Smith was aware of one assault committed by Petitioner while he was in prison.

Trial counsel, who had twenty-five years of experience in the Public Defender's Office, testified that Petitioner was originally charged in juvenile court, and the Public Defender's Office was appointed to represent petitioner. He began representing Petitioner at that time and represented Petitioner throughout the appellate process. Concerning Petitioner's desire to testify at trial, the following exchange took place:

> [Prosecutor]:        . . . I understand [Petitioner] to testify here today that he was not given an option to testify. What is your recollection - -
>
> [Trial counsel]:    This will be the [. . .] one thing that I will be absolutely the most certain about. It didn't happen that way.
>
> [Prosecutor]:       Tell us how it happened.
>
> [Trial counsel]:    Because it is always the client's choice to testify. Now, I may have explained to him why I thought it was a bad idea and all the reasons that I thought things could go bad and at that moment, he may have said, okay, I'm not going to testify.
>
> I can't recall specifically what was said, but had he wanted to testify and made that clear to me, in any shape, form, or fashion, at that moment that that came up, then he would have been allowed to testify, whether I thought it was a good idea or not.
>
> He didn't. I'm - - I'm pretty sure I tried to convince him that - - that where we were in the trial was as good as I thought we could get, and it was all going to go downhill once he took the witness stand because I

did not think that he - - while he is extremely talkative, he does not always answer questions head on. Sometimes he's answering some other question; sometimes, as with your examination of him.

And he would open the way to a skilled examiner, whether it had been Mr. Scott or you or General Brown, whoever it might have been, to have done significant damage to him, plus there might be other things out there that y'all did not have to disclose to us that you could then impeach him with that would undermine everything else that he had said, which we thought had been positive; in the initial interviews, extremely positive. So that was - - that was my thinking.

[Prosecutor]:          In the days leading up to the trial, is that something that the two of you discussed?

[Trial counsel]:      It would have been.
[Prosecutor]:          Okay. And tell me how you would have normally gone about that discussion, other than what you would have - - what you just told us.

[Trial counsel]:      Well, we - - we would have gone over what the - - what we felt the proof was going to be. We would have talked about you will have the opportunity to testify if you want to. Now, here's the pros and here's the cons.

But I would have said something along the lines, but, [Petitioner], until we get there that day and are in the trial, we won't know because that's something that has to be assessed literally at that moment in almost all cases.

[Prosecutor]:          Would you have talked to him about the jury not being able to draw any inference of his failure to testify, had he chose not to?

[Trial counsel]:      We - - we went over some of the jury instructions. Literally, I had the pattern instructions there and went over them. Now, as to telling him that and having the pattern jury instruction before me at that time, I can't say that I had the pattern jury instruction.

Yes, he would have been told just like the Judge has in his instructions that they will be given the instruction that they're not to draw any inference from that.

I don't know of any defense lawyer that is entirely comfortable when their client doesn't testify, but sometimes that's the best strategy, and we felt that was the best strategy at that moment.

[Prosecutor]: And was [Petitioner] advised that no one could prevent him from testifying if he so chose to do that?

[Trial counsel]: Absolutely.

[Prosecutor]: Okay. And you've already stated that you went over the advantages and disadvantages and that it was, at that point, your recommendation that he not testify?

[Trial counsel]: That - - That would have been what I did, yes.

[Prosecutor]: Okay. Would - - in this particular case, did you or - - in addition to you, did anyone else from your office also go over those things with [Petitioner]?

[Trial counsel]: I don't know that any other lawyer did. My investigators at some point may have done that, but they're very, very cautious about doing anything that appears to be practicing law or giving legal advice. So I sort of doubt that they did. We might have - - been together at some time doing it and - - and some of that subject matter may have come up at some other time. I do not recall another lawyer being involved, other than me, on that subject though.

[Prosecutor]: In speaking with [Petitioner] in preparation of that decision, did you feel as if there was anything in his testimony or what his testimony would be if he did testify that would have been in addition to his statement that he gave to police?

[Trial counsel]: Well, I think there was certainly things that - - that [Petitioner] was - - was eager to tell again. Many clients wish to take the witness stand not realizing how dangerous that can be with the cross examination they would face from the State.

But did he have anything that was of any significance that was - - he was going to add? Not that I recall.

[Prosecutor]: Okay.

[Trial counsel]: Now, my view, obviously is a whole lot different from what my client's view is sometimes.

- 14 -

[Prosecutor]:        As far as –

[Trial counsel]:     Just as - - Just as - - well, he thought the two jailhouse snitches, the fact that they were in there together and could concoct perjury was important.  To me what was important was that one or both of them were getting good plea deals and showed bias and prejudice that I could argue to the jury.

Trial counsel testified that "there was no disagreement about [Petitioner] not testifying" at the time that trial counsel and the State had the bench conference about Petitioner testifying.  The following exchange took place at the post-conviction hearing:

[Trial counsel]:  . . . To my recollection, there was no - - because if there had been any issue there, it's not an issue.  The client - - That's one of the things that - - and - - and probably the most important thing that a client had control of and that is whether they testify or not in their own behalf.

[Prosecutor]:        And at the time of the bench conference, I believe General Brown asked if we needed to have a jury out hearing and what has been referred to as the <u>Momon</u> hearing.

[Trial counsel]:     And, foolishly, because I thought there was no controversy about this, I guess I thought that would hold off in the future too.  In hindsight, sure.  There should have been the hearing because then it would have all been on the record.  But there was none and - - and clearly, I think if [Petitioner], if I'm not stating this correctly, if [Petitioner] was sitting there next to me and wanted to testify, the disruption he would have made would have been so evident that everybody would have known that he wanted to testify.  As - - As it should have been for him or any other client of mine or any other defense lawyer that doesn't get to testify when they want to.

On rebuttal, Petitioner testified that he did not tell the trial court that he wanted to testify because trial counsel had told him "if I make any outburst in your Court, [. . . ],  I would be charged with contempt of court."  Petitioner said that he did not hear the bench conference where trial counsel told the court that Petitioner was not going to testify.

*Analysis*

Initially, we will address Petitioner's argument that the failure to conduct a *Momon* hearing should result in automatic reversal.  As pointed out by the State, both the

- 15 -

Tennessee Supreme Court and this court have rejected this argument. In *Momon v. State,* 18 S.W.3d 152, 163-69 (Tenn. 1999), the supreme court held that trial counsel's failure to advise a client of his or her right to testify is subject to harmless error review. The court also stated:

> Only a very limited class of errors have been found to be "structural," and subject to automatic reversal. *See Gideon *166 v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by a biased judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable doubt instruction); *State v. Muse,* 967 S.W.2d 764, 768 (Tenn.1998) (denial of right to be present at jury selection); *State v. Benson,* 973 S.W.2d 202, 207 (Tenn.1998) (denial of right to impartial judge); *State v. Bobo,* 814 S.W.2d 353, 357 (Tenn.1991) (denial of right to trial by jury).

*Id*. at 165-66; *see also Isaac Eugene Jones, III*, No. E2020-02115-CCA-R3-PC, 2011 WL 3612156, at *8(Tenn. Crim. App. Aug. 17, 2011)("We acknowledge the Petitioner's argument that harmless error review of this type of violation is not appropriate. However, the law is well-settled in Tennessee that violations of this type should be subjected to harmless error review.").

Petitioner also seems to raise a stand-alone claim that the failure to conduct a *Momon* hearing alone warrants post-conviction relief regardless of trial counsel's performance in this area. He asserts that his petition for post-conviction relief should be granted "due to the trial court's failure to actively demand that a *Momon* hearing be conducted." However, this issue should have been raised on direct appeal and is not cognizable in a post-conviction proceeding. "A post-conviction petition is not a vehicle to review errors of law as a substitute for direct appeal." *French v. State*, 824 S.W.2d 161, 163 (Tenn. 1992); *see* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . ."); *Mario Deangelo Thomas v. State*, No. W2004-01704-CCA-R3-PC, 2005 WL 1669898, at *2 (Tenn. Crim. App. July 18, 2005)(Petitioner's free-standing claim of a *Momon* violation is waived); *Dedrick D. Chism v. State*, No. W2005-00427-CCA-R3-PC, 2005 WL 3059433, at *7 n. 9)(Tenn Crim. App. Nov. 7, 2005)("The free-standing claim of a *Momon* violation has been waived because it was not presented to the trial court nor raised on direct appeal.") .

- 16 -

As to Petitioner's claim of ineffective assistance of counsel, he argues that trial counsel failed to "demand a *Momon* hearing." More specifically, Petitioner argues that if he had been afforded a *Momon* hearing, he "would have had the opportunity to have taken the stand, looked at the juror's faces and into their eyes, and told them his side of the story. He could have done so while the testimony of the State's witnesses were fresh in his mind and in that of the jurors."

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

A defendant has a constitutional right, under both federal and state law, to testify. *Momon*, 18 S.W.3d at 157. Because the right to testify is a fundamental right, the right must be personally waived by a defendant. *Id.* at 161. "To ensure that the defendant's right to testify has been personally waived by the defendant, the court in *Momon* adopted procedural guidelines that call for defense counsel to request a jury-out hearing to demonstrate that the defendant's waiver of the right to testify has been knowingly, intelligently, and voluntarily made." *State v. Posey*, 99 S.W.3d 141, 148 (Tenn. Crim. App. 2002) (citing *Momon*, 18 S.W.3d at 163).

"Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify."

*Momon,* 18 S.W.3d at 162. The court in *Momon* also expressly stated:

> The procedures are prophylactic measures which are not themselves constitutionally required. As such, the procedures adopted herein do not establish a new constitutional rule which must be retroactively applied . . . . [M]ere failure to follow these guidelines will not in and of itself support a claim for deprivation of the constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant.

*Id.* at 163.

Concerning this issue, the post-conviction court concluded:

> As for the question regarding the hearing as set forth in *State v. Momon,* [trial counsel's] testimony was emphatic. [Trial counsel] was passive versus active in many areas of his testimony, but was absolutely certain that he absolutely advised the Defendant of his right to testify. The Court finds that [trial counsel's] recollection is correct. However, this does not simply answer the *Momon* question. Testimony shows that the [. . .] Defendant was advised of his right to testify. However, because of

the lack of hearing on the record, we move to the question of whether the harmless error exception vitiates this case. The Court finds that the Defendant's testimony was important to his case. However, it had already been given in the form of his recorded statement, so the important aspects were already in the record. Therefore, the Court finds that the testimony would have been cumulative. The Court finds that there was not a lot of corroborating or contradicting the defendant on material issues because the defendant did not testify; however, the Court finds that there could have or would have been admissible contradicting material to the defendant's testimony had the defendant chosen to testify that had not been admissible. The Court finds that the overall strength of the State's case may not have been as strong as the State thought it was, but the verdict in a case is not representative of the strength of the case.

Therefore, the Court finds that the Defendant was advised of his Constitutional right to testify and made a strategic decision not to testify upon recommendation of counsel. The Court also finds that the State proved beyond a reasonable doubt that the failure to have the hearing required under *Momon* was harmless.

The record supports the post-conviction-court's conclusions. Petitioner in this case did not prove his allegations by clear and convincing evidence nor has he shown prejudiced by any alleged deficiencies in trial counsel's performance in this area. Trial counsel testified that the one thing that he was "absolutely the most certain about" was the issue of whether Petitioner was given the option to testify and that it did not happen the way that Petitioner had testified to at the post-conviction hearing. Trial counsel noted that he could not specifically recall what was said, but had Petitioner "wanted to testify and made that clear to me, in any shape, form, or fashion, at that moment that that came up, then he would have been allowed to testify, whether I thought it was a good idea or not." Trial counsel also said that it was always the client's choice to testify. He testified that he might have explained to Petitioner why it was a bad idea for him to testify and "all reasons that I thought things could go bad and at that moment, [Petitioner] may have said, okay, I'm not going to testify."

Trial counsel testified that he and Petitioner would have gone over what the proof would have been and the pros and cons of testifying. He said that he would have also told Petitioner that the jury would be given an instruction that they could not draw any inference from Petitioner's failure to testify. Trial counsel testified that Petitioner was "absolutely" advised that no one could prevent him from testifying if he chose to do so. He said that there was "no disagreement about [Petitioner] not testifying" at the time that trial counsel and the State had the bench conference about Petitioner testifying. Trial counsel also specifically noted that if Petitioner "was sitting there next to me and wanted to testify, the disruption he would have made would have been so evident that everybody

would have known that he wanted to testify." Therefore, the post-conviction court properly concluded that trial counsel advised Petitioner of his right to testify.

Even if trial counsel was deficient concerning this issue, Petitioner has not demonstrated any prejudice. As pointed out by the post-conviction court, Petitioner's testimony would have been cumulative to his statement to police that was introduced at trial. When asked if there was anything of significance that Petitioner's testimony would have added to the statement, trial counsel replied, "Not that I recall." Trial counsel also testified that he was "pretty sure" that he tried to convince Petitioner that "where we were in the trial was as good as I thought we could get, and it was all going to go downhill once he took the witness stand because I do not think that he - - while he is extremely talkative, he does not always answer questions head on." Trial counsel also noted that a "skilled examiner" would have done significant damage to Petitioner and that there "might be other things out there that [the State] did not have to disclose to us that you could then impeach him with that would undermine everything else that he had said, which we thought had been positive; in the initial interviews, extremely positive." Also, as pointed out by the State, there was a risk of Petitioner's prior juvenile record and other illegal activities, which were noted by this court on direct appeal, being admitted as a result of his testimony. *See Victor Thompson*, 2014 WL 605441, at *5. Additionally, there was testimony at the post-conviction hearing that Petitioner had been involved in multiple assaults while he was incarcerated which Petitioner risked being admitted at trial if Petitioner had testified as he wanted to do concerning his non-violent nature. Therefore, the post-conviction court properly determined that Petitioner had not demonstrated any prejudice by trial counsel's failure to request a *Momon* hearing. *See McCall v. State*, No. W2015-01171-CCA-R3-PC, 2016 WL 689639, at *9 (Tenn. Crim. App. Feb. 19, 2016)(no prejudice where "[t]he risk of substantial damage to the Petitioner's credibility was great"); *Porter v. State*, No. E2012-00481-CCA-R3-PC, 2013 WL 5299305, at *12-13 (Tenn. Crim. App. Sept. 18, 2013)(no prejudice where Petitioner's testimony may have strengthened the State's case, and he would have been subject to cross-examination about inconsistent statements); *Jones v. State*, No. E2010-02115-CCA-R3-PC, 2011 WL 3612156, at *8-14 (Tenn. Crim. App. Aug. 17, 2011)(no prejudice where petitioner's testimony on a particular issue would not have been beneficial to the defendant, testimony on another issue would have been cumulative, petitioner would have faced a vigorous cross-examination, and the State's case against petitioner was strong). Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE